## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 23 2018, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Termination of the Parent-Child Relationship of: R.C.; | August 23, 2018 |
| C.C., Sr. (Father), | Court of Appeals Case No. 20A03-1712-JT-2832 |
| *Appellant-Respondent* | Appeal from the Elkhart Circuit Court |
| v. | The Honorable Michael A. Christofeno, Judge |
| The Indiana Department of Child Services, | The Honorable Deborah Domine, Magistrate |
| *Appellee-Petitioner.* | Trial Court Cause No. 20C01-1707-JT-42 |

**Pyle, Judge.**

# Statement of the Case

C.C. ("Father") appeals the termination of the parent-child relationship with his son, R.C. ("R.C."), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in R.C.'s removal or the reasons for placement outside Father's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the R.C.'s well-being; and (3) termination of the parent-child relationship is in R.C.'s best interests.[1] Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.

We affirm.

# Issue

Whether there is sufficient evidence to support the termination of the parent-child relationship.

# Facts

Father and Mother (collectively "Parents") are the parents of R.C., who was born in April 2015. In November 2016, police officers were dispatched to Parents' home after it was reported that they were physically abusing R.C. When police officers arrived at the home, Mother was uncooperative, and

---

[1] R.C.'s mother ("Mother") is not a party to this appeal.

Father was found hiding in a crawl space. R.C. who was wearing only a diaper, was taken to the hospital with head injuries and cigarette burns on his chest. He had no clothing or personal items in the home, and Parents had withheld food from R.C. to punish him. Following his discharge from the hospital, R.C. was placed in foster care.

[4] The juvenile court adjudicated R.C. to be a Child in Need of Services ("CHINS") in December 2016. As a result of the adjudication, the trial court ordered Father to participate in supervised visitation and to complete parenting, domestic violence, and psychological assessments and to follow all recommendations.

[5] Following R.C.'s CHINS adjudication, Father pleaded guilty to domestic battery in the presence of a child and was incarcerated until June 2017. He did not contact DCS immediately following his release from jail, and when he did contact the agency, he did not request visitation with R.C. In July 2017, DCS filed a petition to terminate Parents' parental rights.

[6] At the November 2017 hearing on the termination petition, DCS Family Case Manager Helen Calvin ("Case Manager Calvin") testified that she had met with Father after he had contacted her following his release from jail in June 2017 and that she had provided him with a list of the court-ordered referrals. Case Manager Calvin further testified that Father had not completed the court-ordered domestic violence assessment. Although Father had scheduled an appointment for the assessment in October 2016, he had failed to attend the

appointment. Case Manager Calvin recommended terminating Father's parental rights because the conditions that had resulted in R.C.'s removal had not been remedied. Specifically, Case Manager Calvin explained that she was concerned because the reason for R.C.'s removal was domestic violence and Father had not completed the domestic violence assessment. She was also concerned that Father could not provide R.C. with "safety, stability, or permanency." (Tr. 110). Case Manager Calvin further testified that termination was in R.C.'s best interest because:

> [w]hen we got involved with [R.C.], he had significant trauma. He still has significant trauma. He did not speak, he had significant outbursts where he would hurt himself. He did – the only coping mechanism that he ha[d] to soothe himself was to hit his head. He has thrived in his placement. He – there were concerns that he would never bond, or never speak, and he has bonded to his foster parents, he is starting to speak. And for that significant trauma, not only did he witness the violence between mom and dad, he endured that violence. And neither parent has stepped up to the plate to remedy why DCS got involved. And, so, he needs permanency. He needs stability, and he needs safety. He needs people who are going to keep him safe.

(Tr. 111).

[7] DCS Permanency Case Manager Tiarra Hammond ("Case Manager Hammond") testified that R.C.'s case had recently been transferred to her from Case Manager Calvin. According to Case Manager Hammond, when the case was transferred to her, she attempted to contact Father, his father, and other relatives, but was unable to reach anyone. Case Manager Hammond further testified that the conditions that resulted in R.C.'s removal had not been

remedied and were unlikely to be remedied. She also testified that termination was in R.C.'s best interest. Specifically, the case manager explained that Parents had "not addressed the reasons for DCS's involvement. [R.C.] needs a stable, safe home." (Tr. 136).

[8] Psychologist Alan Wax ("Dr. Wax"), who completed a parenting evaluation of Father in September 2017 testified that Father suffered from chronic depression and anxiety. Further, Dr. Wax's evaluation revealed that Father's expectations of R.C. exceeded the child's developmental capabilities and that he expected R.C. to meet his needs rather than expecting himself to meet his child's needs. Father also saw "using corporal punishment as part of a parenting repertoire." (Tr. 82).

[9] In addition, R.C.'s foster mother ("Foster Mother") testified that R.C. had "improved a lot since he first came," but he still had a lot of special needs. (Tr. 126). For example, R.C. had been involved in physical and speech therapy to address his developmental deficits. He was also "afraid he [was]n't going to get food when he want[ed] it." (Tr. 127). R.C.'s food issues were further compounded by food allergies to peanuts, milk, wheat, yeast, eggs, and corn, which "made it more challenging because there [was] a lot that [foster parents could not] give him." (Tr. 127). Foster Mother testified that she and her family wanted to adopt R.C. and were committed to his treatment for his developmental deficits and food allergies.

[10]    Court-Appointed Special Advocate Julie Tuskey ("CASA Tuskey") testified that when R.C. was removed from Parents' home, he was non-verbal and his only method of communication was banging his head on the floor or on the wall. CASA Tuskey further explained that R.C. needed a "safe, stable, loving home that [was] free of domestic violence, abuse and neglect, and loving, nurturing parents that [were] knowledgeable of his special needs, medical, physical, emotional, developmental and [were] willing and capable of meeting those needs." (Tr. 143). CASA Tuskey opined that foster parents were capable of meeting these needs. She also explained that she would not be in agreement with placing R.C. in the care of either parent because "he [was] a very special needs child and [she had] grave concerns considering that this case ha[d] been opened for close to a year and neither parent ha[d] been engaged in . . . services and neither of them ha[d] had any contact with the child for a number of months and they [had] both had the opportunity to." (Tr. 144). According to CASA Tuskey, termination was in R.C.'s best interest because he needed permanency, and even if Parents eventually chose to engage in services and to enhance their parenting abilities, it would be too late because R.C. had current needs.

[11]    Lastly, Father testified that he had been taking parenting classes, which were required by his probation, and that he had not seen R.C. since the child was removed from his home the prior year. He also testified that he did not have stable housing for R.C. The trial court terminated the parental rights of both Mother and Father. Father now appeals.

# Decision

[12] As a preliminary matter, we note that Father challenges none of the trial court's findings. As a result, he has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (explaining that unchallenged trial court findings were accepted as true). We now turn to the issue in this case.

[13] Father argues that there is insufficient evidence to support the termination of his parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.,* 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.,* 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

[14] When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly

erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

[15] A petition to terminate parental rights must allege:

> (A) that one (1) of the following is true:
>
>> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>>
>> (ii) A court has entered finding under Ind. Code § 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
>>
>> (iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date that child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;
>
> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been
> adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of
> the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.,* 989 N.E.2d at 1231.

[16] Here, Father argues that there is insufficient evidence to support the termination of his parental rights. Specifically, he first contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in R.C.'s removal or the reasons for placement outside the parent's home will not be remedied; and (2) a continuation of the parent-child relationships poses a threat to R.C.'s well-being.[2]

[17] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *A.K.,* 924

---

[2] Father also makes a brief cursory argument that the "evidentiary hearing on termination of parental rights was held more than six months after the dispositional order but less than fifteen months after R.C. had been removed from his home." (Father's Br. at 6). However, Father has waived appellate review of this issue because he has failed to support it with cogent argument and relevant authority. *See Kentucky Nat'l. Ins. Co. v. Empire Fire and Marine Ins. Co.*, 919 N.E.2d 565, 598 (Ind. Ct. App. 2010) (holding that argument was waived for failure to cite authority or provide cogent argument). Waiver notwithstanding, we find no error. INDIANA CODE § 31-35-2-4(b)(2)(A) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements. *See In re A.K.,* 924 N.E.3d 212, 220 (Ind. Ct. App. 2010). Father concedes that DCS established the first requirement where the petition alleged and DCS proved that R.C. had been removed from Father under a dispositional decree for at least six months. We therefore find no error.

N.E.2d at 220. We therefore discuss only whether there is a reasonable probability that the conditions that resulted in R.C.'s removal or the reasons for his placement outside Father's home will not be remedied.

[18] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013). The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[19] Here, our review of the evidence reveals that R.C. was removed from Father's home because of domestic violence. R.C., who was wearing only a diaper at

the time of removal, was taken to the hospital with head injuries and cigarette burns on his chest. He had no clothing or personal items in the home, and Parents had withheld food to punish him. Evidence presented at the termination hearing also revealed that R.C. was developmentally delayed at the time of removal as evidenced by his inability to speak when he was placed with his foster parents. The only coping mechanism that he had at that time was banging his head on the floor or wall. R.C. also had food issues and allergies. By the time of the termination hearing, R.C. was bonding with his foster parents and beginning to speak.

[20] The evidence further reveals that although Father had been out of jail for five months, he had neither completed a domestic violence assessment nor asked to visit R.C. Father had not seen R.C. since he was removed from Parents the previous year. A parenting evaluation revealed that Father suffered from chronic anxiety and depression, and that his expectations of R.C. exceeded the child's developmental capabilities. The evaluation further revealed that Father expected R.C. to meet his needs rather than expecting himself to meet R.C.'s needs. In addition, Father did not have stable housing for R.C. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in R.C.'s removal would not be remedied. We find no error.

[21] Father also argues that there is insufficient evidence that the termination was in R.C.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of

the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. The trial court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. In addition, a child's need for permanency is a central consideration in determining the child's best interests. *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cnty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

[22] Here, our review of the evidence reveals that CASA Tuskey testified that termination was in R.C.'s best interests because R.C. needed a permanent, stable home that was capable of meeting his special needs. Case Managers Calvin and Hammond also testified that termination was in R.C.'s best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in R.C.'s best interests.

[23] We reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232,

1235 (Ind. 1992). We find no such error here and therefore affirm the trial court.

[24] Affirmed.

Vaidik, C.J., and Barnes, Sr.J., concur.